UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LISA ESTELLA BOYD                                    CIVIL ACTION

VERSUS                                               NO. 14-2166

CAROLYN W. COLVIN, ACTING                            SECTION "R" (2)
COMMISSIONER OF SOCIAL SECURITY

## FINDINGS AND RECOMMENDATION

Plaintiff, Lisa Estella Boyd, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act.  42 U.S.C. § 423.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

## I.   PROCEDURAL HISTORY

Boyd filed her application for DIB on January 22, 2009, alleging disability beginning December 26, 2008, due to pain in her back, joints and hands.  (Tr. 421-24, 475).  Her date last insured for DIB is June 30, 2009.  After her claims were denied at the initial agency level, she requested a hearing before an Administrative Law Judge (ALJ), which was held on January 20, 2010.  (Tr. 169-88).  The ALJ issued a decision denying the application on February 26, 2010.  (Tr. 190-203).  The Appeals Council vacated that decision and remanded the matter to the ALJ on April 6, 2011.  (Tr. 204-08).

A different ALJ held a second hearing on June 27, 2011 (Tr. 140-68), and rendered an unfavorable decision on August 15, 2011. (Tr. 209-19). On February 11, 2013, the Appeals Council again vacated and remanded the case to the ALJ for further evaluation and fact findings. (Tr. 225-28). A third hearing was convened on August 29, 2013, but the ALJ decided to continue it so that medical experts could be retained to review the medical records and testify regarding their opinions. (Tr. 130-39). A fourth hearing was held on November 13, 2013, at which two medical experts, psychiatrist John Dusay, M.D., and neurosurgeon Woodrow Janese, M.D., and plaintiff's treating physician, Jack Heidenreich, M.D., testified by telephone. The ALJ again continued the hearing to allow Dr. Heidenreich to review his older records and testify more specifically regarding Boyd's condition before her last insured date of June 30, 2009. (Tr. 51-129). A final hearing was held on January 30, 2014. (Tr. 39-50).

The ALJ denied Boyd's application on March 27, 2014. (Tr. 13-38). After the Appeals Council denied review on July 24, 2014, the ALJ's decision became the Commissioner's final decision for purposes of this court's review. (Tr. 1-4).

Plaintiff filed a timely memorandum in support of her appeal. Record Doc. No. 13. Defendant filed a timely reply memorandum. Record Doc. No. 14.

II.     STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.     The ALJ failed to accord controlling weight to the opinions of Boyd's treating primary care physician, Dr. Jack Heidenreich.

B.     The ALJ's residual functional capacity assessment is not supported by substantial evidence.

C.     The ALJ violated the Appeals Council's remand order and erroneously failed to find that plaintiff's depression is a severe impairment.

D.     The ALJ violated the Appeals Council's remand order by failing to analyze the effects of plaintiff's obesity.

III.    ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

1.     Plaintiff met the insured status requirements of the Act through June 30, 2009.

2.     Through the date last insured, Boyd had severe impairments consisting of degenerative disc disease of the lumbar spine, fibromyalgia and obesity.

3.     She had no clinical evidence of a formally diagnosed mental affective disorder. Her symptoms of depression do not constitute a severe impairment.

4.     Through the date last insured, Boyd had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, App. 1, including specifically Listing 1.04 for disorders of the spine.  Her medically determinable impairment of depression did not cause more than minimal limitation in her ability to perform basic mental work activities and was therefore non-severe.

5.     Through the date last insured, plaintiff had the residual functional capacity to perform light work.  She was able to lift and carry twenty pounds

occasionally and ten pounds frequently; walk and stand for six hours in an eight-hour work day; grasp, turn and hold objects; and stoop occasionally.

6.    Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  However, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

7.    Through the date last insured, Boyd could not perform her past relevant work as a stock clerk and caregiver.

8.    Plaintiff was 47 years old on the date last insured and has at least a high school education.

9.    Considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform, including cashier, retail sales clerk and customer service representative.

10.   Boyd was not under a disability at any time from December 26, 2008, the alleged onset date, through June 30, 2009, the date she was last insured.

(Tr. 17-31).

IV.   ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v.

4

Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363-64; Perez, 415 F.3d at 461.  This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision.  Halterman ex rel. Halterman v. Colvin, No. 12-31099, 2013 WL 5913945, at *2 (5th Cir. May 9, 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364.  The Commissioner, rather than the courts, must resolve conflicts in the evidence. Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez, 415 F.3d at 461).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for DIB, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2009).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[1]  Id. §§ 404.1520, 416.920; Alexander v. Astrue, 412 F. App'x 719, 720 (5th Cir. 2011) (citing Audler v. Astrue,

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

501 F.3d 446, 447 (5th Cir. 2007)); Perez, 415 F.3d at 461. The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Id.

The claimant has the burden of proof under the first four parts of the inquiry. If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Alexander, 412 F. App'x 720-21; Perez, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.'" Chrisner v. Astrue, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting Wren v. Sullivan, 925 F.2d 123, 126 (5th Cir. 1991)); accord Perez, 415 F.3d at 463.

B.      Factual Background

        1.      The first hearing on January 20, 2010

Boyd testified at the first hearing that she is 48 years old, had graduated from high school and lives in Raceland, Louisiana. She said she is five feet five inches tall, weighs 208 pounds and had gained weight because of steroid shots. She stated that she had a

shot in her shoulder the previous month and had two shots in her lower back during the previous year.  (Tr. 173-74).

Plaintiff said she had needed the injections since she was in an automobile accident in April 1995 and that the pain had been getting worse recently.  (Tr. 174-75). She testified that she stopped working in December 2008 as a result of lower back pain because she could no longer stand and/or walk and perform her work duties, even though she only worked five hours per day at that time.  She stated that the back pain radiates into both legs and down to her heels, but not her toes.  She said that the pain is excruciating and that her leg pain worsens when she walks or stands.  (Tr. 176).

Boyd testified that she always has lower back pain, but that it was not too bad at the hearing because she had not done anything to aggravate it that day.  She stated that doing housework and walking aggravate the pain.  She estimated that she can stand for 15 to 20 minutes or walk for 30 minutes before the pain gets worse and she has to sit for a while.  (Tr. 177-78).  Plaintiff had a cane at the hearing and said she always uses it for balance if she has to walk any distance, such as when she goes shopping, but she rarely goes shopping now.  She said she is right-handed and uses her right hand for the cane.

Plaintiff stated that she takes medications and lies down at home, or sits if she is not at home, to relieve the pain.  (Tr. 178).  She said that drowsiness is the only side effect of her medications and that she sleeps as often as she takes them, which could be every day.  She testified that she has to take a break and lie down for a while when she

cooks, washes dishes or does laundry.  She stated that she can wash clothes if someone puts the basket of clothes up where she can reach it and that she can put clothes in the dryer, but cannot bend down and get them out of the dryer.  (Tr. 179).

Boyd testified that she lies down between three and five times on a typical day for 60 to 90 minutes at a time to relieve her pain.  She said she does not cook on a daily basis because of her back pain, but when she does cook, she makes a big meal so that some of the food can be frozen for another time when she cannot cook.  She stated that she cooks at least twice during the week and every Sunday.  She said her husband, adult son and college-age daughter live with her.  (Tr. 180).  She testified that she sweeps the floors, but cannot mop them.

Plaintiff said she sees her family doctor, Dr. Jack Heidenreich, for her pain and she has been seeing him for 10 to 15 years.  She said that he told her that she has a disc problem, fibromyalgia[2] and arthritis starting in her hands, and that he gave her the steroid shots.  She stated that she had physical therapy four to five years earlier and aquatic therapy, which helped relax her muscles and bones while she was doing it.  (Tr. 181-82).  She said she no longer does aquatic therapy because of her financial situation.

Boyd testified that her depression comes from hurting all the time and being unable to do the things she used to do.  She said she cries a lot, stays alone in her room

---

[2]Fibromyalgia is "[a] common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown." Stedmans Medical Dictionary, available on Westlaw at STEDMANS 331870.

and isolates herself from everyone for two to three days at a time. (Tr. 182). She stated that she is able to sleep for about five hours with the new medicine that Dr. Heidenreich recently prescribed. (Tr. 182-83).

Plaintiff said that pain prevents her from sleeping and affects her ability to sit, but that she can sit longer in a hard chair than a big, soft, comfortable one. She testified that she had no problem sitting in the chair at the hearing. She stated that she can sit for a longer time if she does nothing strenuous during the day to irritate her back. She does not believe that she could perform an eight-hour, full-time sedentary job because she could not sit for that long. (Tr. 183-84). She said she could sit for about two hours in a good, comfortable chair and that she would have pain and numbness in her legs after that time. She said she walks around or elevates her legs when they get numb. (Tr. 184).

Boyd stated that the job she held the longest was as a stocker for five years at Walmart before her automobile accident in April 1995. She said she loaded and unloaded trucks and put freight up on pallets in that job. (Tr. 185).

2.    The second hearing on June 27, 2011

Plaintiff's attorney confirmed at the second hearing that Boyd had only applied for DIB under Title II of the Act because her husband works, that her date last insured was June 30, 2009, and that she must prove that she was disabled on or before that date. (Tr. 143-44). Boyd testified that her condition has gotten progressively worse. (Tr. 144-45). Her attorney stated that Dr. Heidenreich had filled out a residual functional capacity

form on January 18, 2010, and that Dr. Heidenreich had specifically been asked to address plaintiff's condition from her alleged onset date of December 26, 2008, so that his opinions on that form addressed the relevant time period. (Tr. 145-46).

Boyd testified that she had a nerve stimulator implanted in March 2011, which initially provided about 50 percent relief of her pain, but then became less effective. She stated that the stimulator makes moderate pain tolerable, but does not help as much with her severe pain. (Tr. 148-49). She said that the device eases her moderate pain by stimulating the nerves electronically, but does not take the pain away completely. She testified that she controls the stimulator by turning it on and off. (Tr. 149).

Boyd said she stopped working around Christmas 2008, because she could no longer tolerate the pain and was sometimes unable to do her job as a home health care worker, which was a physical job. She stated that she had a pounding, twisting pain in her lower back and a burning, stinging sensation down her legs to her toes at that time. She said that Dr. Heidenreich referred her to Dr. Cowen after medications, injections, physical therapy and aquatic therapy did not work. She testified that aquatic therapy made her feel lighter in the pool and for about an hour afterward, but the pain came back. She stated that physical therapy helped a little bit, but the pain always came back and was then more severe. (Tr. 152). She said she had pain and burning in her hands and feet in 2008, and that she sometimes was unable to pick up things or would drop things because her hands were so weak. (Tr. 152-53).

11

Plaintiff testified that she had nerve conduction studies and was told that she had nerve damage from fibromyalgia on her right and left sides, which is more severe on the right. She stated that sometimes her feet are numb and she would lose her balance and that she has to be careful not to get up too fast. (Tr. 153). She said this is why she used a cane on the day of the hearing, which Dr. Heidenreich had prescribed.

Boyd stated that Dr. Jolly investigated the burning sensation in her hands and feet, and that she takes medications for muscle spasms in her lower back and legs. She said she has muscle spasms most of the time, which get stronger and stronger, and then ease off, but then come back. She testified that the spasms are sometimes very small and tolerable, but sometimes she has to stop whatever she is doing to let the spasm pass. (Tr. 154). She said the stimulator is intended to help with the muscle spasms and that she can turn it on and increase the "volume" to "shock" the muscle when a spasm occurs. (Tr. 155). She stated that she has spasms every day, but that they are sometimes small and not too bad.

Plaintiff testified that she cannot get out of bed when she has severe pain and that her 23-year-old daughter who lives with her helps her to bathe at those times. She said she has severe pain on two to three days per week, but she used to have it more often before the nerve stimulator implantation.

Boyd stated that her neurologist, Dr. Jamie Huddleston, sent her to an oncologist, Dr. James M. Schweitzer, at Rapides Regional Health Center because lab tests showed

that she had a high protein level in her blood.  She said Dr. Schweitzer believed the elevated protein had something to do with chronic inflammation, possibly caused by fibromyalgia.  She testified that she takes medication for anemia.  (Tr. 157).  She stated that her medications cause drowsiness, disorientation and daytime sleeping.

Plaintiff said that, on a day with moderate pain, she spends most of her waking hours with her legs propped up to prevent leg numbness and stinging pain in her back and legs.  She stated that she stays in bed all day when she has severe pain.  (Tr. 158).  She testified that Dr. Heidenreich prescribed Ambien[3] and Seroquel[4] to help her sleep and that she sleeps about eight hours per night with these medications.

Boyd stated that she suffers from depression because of her pain and being locked up in the house unable to do the things she used to do.  She said she sometimes stays in her room for many days without going outside or associating with anyone.  (Tr. 159).

3.     The third hearing on August 29, 2013

Following the second remand order from the Appeals Council, the ALJ convened a third hearing.  He stated that he had decided not to send plaintiff for a consultative examination because her current condition is not determinative of whether she was

---

[3]Ambien (generic name: zolpidem tartrate) is "used for the treatment of insomnia, specifically for people who have trouble falling asleep and/or wake up often during the night." PDRhealth (PDR Network, LLC 2015), http://www.pdrhealth.com/drugs/ambien-cr (visited July 13, 2015).

[4]Seroquel XR (generic name:  quetiapine) is used to treat schizophrenia, bipolar disorder and major depressive disorder.  Id., http://www.pdrhealth.com/drugs/seroquel-xr (visited July 13, 2015).

disabled before June 30, 2009, her date last insured.  However, he decided that he needed expert medical testimony to determine the issues for which the Appeals Council had remanded the case.  Therefore, he continued the hearing until he could arrange for a neurologist and a psychiatrist to testify on the same day.  (Tr. 133-35).  He noted that he would advise the medical experts to focus on the period before and shortly after June 30, 2009, through the end of 2009, which could reflect plaintiff's condition during the relevant time period, but that evidence from 2011 through 2013 was unlikely to reveal her condition in 2009.  (Tr. 136).

### 4.   The fourth hearing on November 13, 2013

John M. Dusay, M.D., a psychiatrist, and Woodrow Janese, M.D., a neurologist, neither of whom had examined plaintiff, testified by telephone at the fourth hearing as expert witnesses.  Jack W. Heidenreich, M.D., plaintiff's primary treating physician, also testified by telephone.  The ALJ advised both medical experts that Boyd's alleged disability onset date was December 26, 2008, and that she must prove that she was disabled before her last insured date of June 30, 2009.  (Tr. 54, 57-58, 72).

Dr. Dusay stated that he is a board-certified, practicing psychiatrist in San Francisco, California, with more than 20 years of experience testifying in Social Security proceedings.  He said he had reviewed the medical exhibits 1F through 27F and is familiar with the Commissioner's listings.  (Tr. 55-56).  Dr. Dusay testified that Boyd equals Listing 12.04 for affective disorders now, but that it is difficult to determine when

14

she first met the listing. He observed that she has had fibromyalgia and pain throughout the time period covered by the medical exhibits, but that her depressive symptoms of hopelessness, fatigue, lack of energy and anhedonia[5] showed up in the records approximately one year ago at a level that she was being treated for them. (Tr. 56-57). Dr. Dusay stated that plaintiff's symptoms have been occurring for at least one year and that she was given Pristiq,[6] an antidepressant. He said she had been given substantial doses of antidepressant medications as far back as April 11, 2011, but she has never had a psychiatric work-up. (Tr. 57). He opined that she did not have a psychiatric illness that met any listing before June 30, 2009, and that she equaled Listing 12.04 at least as of April 11, 2011. (Tr. 58-59).

On cross-examination by plaintiff's attorney, Dr. Dusay testified that Boyd entered treatment with Dr. Tarun Jolly in April 2011 and that her depression was thought to be significant enough at that time to have medication. He stated that she had taken Cymbalta[7] and that she had been in and out of depression since April 2011, which had been much more severe during the past year. (Tr. 59). He opined that her depression is

---

[5]Anhedonia is the "[a]bsence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedmans Medical Dictionary, on Westlaw at STEDMANS 42670.

[6]Pristiq is a serotonin and norepinephrine reuptake inhibitor used to treat major depressive disorder. PDRhealth, http://www.pdrhealth.com/drugs/pristiq (visited July 13, 2015).

[7]Cymbalta is a serotonin and norepinephrine reuptake inhibitor used to treat major depressive disorder, generalized anxiety disorder, pain from diabetic peripheral neuropathy, fibromyalgia, long-term osteoarthritis and low back pain. Id., http://www.pdrhealth.com/drugs/cymbalta (visited July 13, 2015).

secondary to her fibromyalgia and pain, which she had long before she had depressive symptoms that have been noticed and treated more recently.  (Tr. 59-60).

Dr. Dusay said that Drs. Heidenreich and Huddleston had previously diagnosed Boyd with depression and that she had been given Cymbalta.  (Tr. 60).  He stated that Dr. Heidenreich had diagnosed plaintiff with fibromyalgia, depression and insomnia and had prescribed antidepressants as far back as 2008, 2010 and 2011.  He testified that her depression level fluctuated, was under better control in 2012 and apparently was not as severe in the earlier years.

Dr. Dusay said he could not say with great certainty that Boyd's depression was not as bad in 2008 because, although the medical records use that word, she was never worked up psychiatrically.  Agreeing that Dr. Heidenreich had noted that plaintiff had depression, Dr. Dusay nonetheless could not say how serious her depression was at different times, particularly in 2008.  (Tr. 63-64).  He testified that he could not give a mental residual functional capacity assessment based on these records, which "just have words like depression and anxiety" and sometimes insomnia.  (Tr. 65).

Dr. Dusay testified that pain and depression are both subjective and that there are no biological markers to test a person's level of depression.  (Tr. 65-66).  He believes that fibromyalgia is diagnosed subjectively based on specific criteria, although he would defer to a neurologist on that.  He stated that subjective complaints of pain are always difficult because some injured people report a very high level of pain, while others with

the same injury hardly feel it.  He opined that depression is similar and that depressed people focus more on the negative things in their lives and would both look for and report more pain.  (Tr. 66-67).  He would agree in general that the subjective experience of the depressed person would be of greater suffering than a person who is not depressed. (Tr. 67).

Dr. Dusay testified that chronic pain eventually and usually leads to depression as the person becomes worn down, feels more hopeless and reports mounting pain and depressive symptoms together.  He thinks that this happens with fibromyalgia and that it happened to Boyd in this case.  (Tr. 67-68).  He stated that it is very difficult to say at what point most people with chronic pain would also begin to suffer depression because every person feels subjective pain and depression differently.  Generally, he thinks that plaintiff has had problems for at least five years, but that she was not complaining about depression much five years ago and that it gradually evolved.  Dr. Dusay said he could not pinpoint when that happened, but that it fits the usual timeline he has seen.

Dr. Dusay testified that the records indicate that Boyd had an accident with injury in 1995 and worked with pain for about 13 years after that.  (Tr. 69).  He agreed with plaintiff's attorney that the records indicate that Boyd became overwhelmed with pain, fibromyalgia and depression, was forced to stop working and began getting more specific treatment at that time.  (Tr. 70).  Dr. Dusay said he would not be surprised if the neurologist who was scheduled to testify after him agreed with Dr. Heidenreich's

statement in September 2013 that plaintiff seems to be disabled by fibromyalgia and pain. He testified that there is no question that Boyd has had pain since the 1995 accident, but it is difficult to draw a line and say when she became depressed.  (Tr. 71).  He stated that he could draw that line in 2011 and that she is very depressed now, but that, although she was depressed in 2009, it seemed to wax and wane at that time.

Dr. Woodrow Janese stated that he is a board-certified neurosurgeon who practices neurology and neurosurgery in Houston, Texas; that he has testified in Social Security proceedings for about ten years and is familiar with the listings; and that he reviewed Exhibits 1F through 27F.  (Tr. 73-74).  He opined that Boyd does not meet or equal Listing 1.04 for spinal disorders because no objective evidence supports such a finding. He testified that she has had normal physical and neurological examinations and diagnostic studies, including MRIs (magnetic resonance imaging) of her lumbar and cervical spine and x-rays of her lumbosacral spine as far back as 2008.  (Tr. 74).

Dr. Janese summarized the medical records as follows.  Plaintiff by then was 52 years old and is obese at five feet five inches tall and 209 pounds.  In August 2010, she had an MRI of the cervical spine that demonstrated degenerative changes and facet arthropathic changes.  (Exhibit 10F-1, Tr. 703).  She had a negative EMG[8] of her lower extremities in August 2008 (Exhibit 2F-3, Tr. 527) and was diagnosed with fibromyalgia

---

[8]Electromyography (EMG) is the recording for diagnostic purposes of electrical activity generated in muscle.  Stedmans Medical Dictionary, on Westlaw at STEDMANS 283130.

syndrome.  Exhibit 10F-3 (Tr. 705 dated August 3, 2010) showed negative examination results and that Boyd's gait, motor, sensory, reflexes, cranial nerves and coordination were all normal.  Examinations on October 25, 2010 (Exhibit 11F-3, Tr. 708), and in March 2011 (Exhibit 12F-3, Tr. 712), showed that a spinal nerve stimulator had been placed and that she was doing well postoperatively.  The records mention low back complaints since 1995.  Lab tests revealed normal renal and liver functions and negative antibodies.  (Tr. 75-76).

According to Exhibit 16F (Tr. 773 dated June 16, 2011), Boyd was taking Oxycontin[9] and had been taking it, benzodiazepines[10] and hypnotics periodically since May 2009 into 2013.  On Exhibit 19F-3 and 19F-5 (Tr. 832 and 834, dated December 5, 2012), she had diagnoses of hypertension, fibromyalgia syndrome, lumbosacral spondylosis[11] and lipid metabolism dysfunction and was on opiates, benzodiazepines and hypnotics.  An MRI of plaintiff's lumbosacral spine in September 2009 demonstrated

---

[9]Oxycontin (generic name: oxycodone) is used to treat moderate to severe, around-the-clock pain. PDRhealth, http://www.pdrhealth.com/drugs/oxycontin (visited July 13, 2015).

[10]Benzodiazepines, such as Xanax (generic name: alprazolam), are sedative-hypnotics prescribed to treat anxiety and insomnia. Id., http://www.pdrhealth.com/diseases/drug-abuse/symptoms (visited July 13, 2015).

[11]Spondylosis is ""[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedmans Medical Dictionary, on Westlaw at STEDMANS 840410. Ankylosis is "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." Id. at STEDMANS 23900.  However, the exhibit page that Dr. Janese cited actually has a diagnosis of spondylitis, which is inflammation of one or more of the vertebrae. Id. at STEDMANS 840270.

degenerative changes.  (Exhibit 1F-1, Tr. 523)[12]  In April 2013 (Exhibits 20F-5 and 20F-7, Tr. 879, 881), plaintiff was on Oxycontin and Flexeril[13] and had normal motor reflex, sensory and coordination on physical examination.  In June 2013, she had normal reflex, gait and sensory examination.  (Exhibit 22F-15, Tr. 932).  Exhibit 3F (Tr. 531-38) is a physical residual functional capacity assessment by Dr. Charles Lee in April 2009, with a diagnosis of lumbosacral spine degenerative disc disease and complaints of left lower extremity discomfort.  Boyd was given a light duty limitation[14] in that assessment. Exhibit 4F-40 (Tr. 578) shows that she was on opiates and benzodiazepines in May 2009. (Tr. 76).

Dr. Janese opined that plaintiff does not meet or equal Listing 1.04 concerning her back.  He does not think that her complaints regarding her neck were severe.  He based his opinions on her multiple normal examinations over four to five years and normal diagnostic studies, including an EMG.  Based on the objective findings, he assessed

---

[12]The cited exhibit is actually dated September 12, 2008, not 2009.

[13]Flexeril (generic name: cyclobenzaprine) "is a muscle relaxant used in combination with rest and physical therapy for the relief of severe and painful conditions, such as muscle spasms due to sprains, strains, or pulls."  PDRhealth, http://www.pdrhealth.com/drugs/flexeril (visited July 13, 2015).

[14]

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. . . .  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Boyd with a residual functional capacity for medium work.[15]  He would wean her off the opiates and benzodiazepines because they do not seem to be working.  He stated that these medications are not recommended for treating fibromyalgia and are not recommended for treatment over five years.  (Tr. 77).

Dr. Janese said that plaintiff's diagnoses remained the same over the years, as he noted when he previously summarized her diagnoses approximately every two years.  He would assess her with a medium residual functional capacity over the entire time period.  He testified that her complaints were "pretty much all subjective" and she would complain about her back, then would call and complain about her hips and neck.  He did not believe that these complaints were feigned, but "these are just arthritic pain that are treated expediently and only last for a day or two, as everyone has."  To the extent she might have any nonexertional limitations, such as difficulty maintaining attention or completing work tasks, he opined that her medications are probably contributing to that and are not efficacious.  (Tr. 78).

On cross-examination by plaintiff's attorney, Dr. Janese testified that an antalgic gait is a painful-appearing gait, which is a subjective clinical finding based on pain that a person may be feeling in her joints, knees, hip, ankle or foot.  (Tr. 79).  He said that an antalgic gait is a finding or an observation, not a diagnosis.

---

[15]"Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  A person who can perform medium work can necessarily also perform light and sedentary work.  20 C.F.R. § 404.1567(c).

With respect to the MRI finding on September 12, 2008, that plaintiff has degenerative disc disease at L5-S1 and Dr. Janese's prior testimony that her MRIs were normal, he explained that degeneration is a normal finding. He stated that a person begins to degenerate as soon as she stands on two feet because she is weight-bearing and weight-bearing causes chronic injury and the development of spondylosis. (Tr. 80-81). Therefore, he said that degeneration is not an abnormal finding. He testified that he does not interpret the MRI as normal and that the MRI report says that Boyd has "mild degenerative changes." He stated that the MRIs taken about two years apart found about the same thing, whereas he would expect the changes to progress if the patient still has the complaints. Generally, he said that, if it does not progress, it is static and should not cause any complaints. (Tr. 81). Dr. Janese explained that the notation on Exhibit 1F-1 (Tr. 523, MRI of lumbar spine dated September 12, 2008) of disc degenerative disease that is slightly advanced since prior examination of October 28, 2005, means that the degeneration has progressed because the patient has aged. (Tr. 81-82). He said that if there is no intervening accident or injury and the report concerns a problem that occurred 10 to 15 years ago, the problem should be static.

Dr. Janese stated that he was not saying that any finding of degenerative disc disease in a person of a certain age is a normal finding. Rather, he testified that any significant finding on x-ray or MRI should be corroborated and that there should be findings on physical examination. He stated that the important part of the doctor-patient

relationship is not radiology or the MRI, but the physical examination and the signs, such as reflexes, muscle weakness, coordination and the other things he mentioned earlier. (Tr. 82).

Dr. Janese said that pain is a subjective complaint which is important, but its importance is minimized if the physical examination and the corroborative diagnostic studies show no basis for the pain complaint. He did not agree with plaintiff's attorney that a complaint of pain is corroborated by an MRI. He testified that pain is corroborated by physical examination and that the doctor's findings on physical examination are supported by ancillary diagnostic studies, such as an MRI or EMG. (Tr. 83-84).

Dr. Janese stated that the EMG performed by Todd Cowen, M.D., in August 2008 (Exhibit 2F-3 and 2F-4, Tr. 527-28), was negative as to plaintiff's lower extremities, but that the report stated that Boyd "has mild findings suggestive of a mild acute right S1 radiculopathy."[16] (Tr. 84-85). Dr. Janese testified that he did not regard this as a positive finding because it was not supported by physical examination. He said that the EMG was suggestive of mild findings of acute right S1 radiculopathy, but the patient should have a reduced ankle reflex, S1 nerve root weakness, muscle weakness and "a sensory spinal." He stated that a patient with a radiculopathy that is supported by physical examination could have pain or numbness. (Tr. 85). Dr. Janese agreed that there is a specific type of pain usually associated with findings of radiculopathy. He testified that the patient

---

[16]Radiculopathy is a "[d]isorder of the spinal nerve roots." Id. at STEDMANS 347610.

should have a positive straight leg raising test, which moves the swollen nerve root over the disc and usually reproduces the shooting pain about which the patient complains.  He said that the pain is similar to when a person hits his elbow and the pain shoots down into his fingers.  (Tr. 86).  He does not believe that Boyd has radiculopathy and he disagrees with Dr. Cowen's opinion that she does.  (Tr. 86-87).

Dr. Janese said that plaintiff has degenerative disc disease, but that it is not abnormal to have it.  (Tr. 87).  He testified that degenerative disc disease can reasonably be expected to produce a certain kind of pain for a couple of hours, or that disc pain can be caused by moving around more than usual, which hurts for a day or two, but that the pain goes away with rest and/or ibuprofen or topical methyl salicylate cream.

Dr. Janese testified that he did not mean to say that the EMG studies were normal, only that they were not significant.  He disagreed with Dr. Huddleston's impression that an EMG study she conducted on Boyd on April 15, 2010 (Exhibit 6F, Tr. 656-60) showed radiculopathy.  Based on plaintiff's medical records and physical examinations, Dr. Janese does not believe that she has radiculopathy.  (Tr. 88-89).  He testified that there are some abnormalities on the tests, but he would not draw the conclusion from the abnormalities that Boyd has a radiculopathy, which is a specific presentation and usually indicates that something is compressing a nerve root.  (Tr. 92-93).  He stated that EMG studies are not usually done to diagnose radiculopathies, which are diagnosed by a physical examination and usually a CT scan and an MRI.  (Tr. 93).

24

The ALJ posed a hypothetical question to Dr. Janese in which he should assume that the ALJ accepts the diagnosis of radiculopathy as stated on page 20 of Exhibit 6F and then state whether that has any significance for plaintiff's residual functional capacity.  Dr. Janese testified that he would not change his opinion that Boyd does not have a radiculopathy, based on his review of the records, her physical examinations and the minor or mild abnormalities seen on the MRIs and EMGs.  (Tr. 93-94).  However, assuming that she does have a radiculopathy, Dr. Janese stated that she would need some period of recuperation or rehabilitation or possibly some type of intervention.  He said a person with radiculopathy needs to rest in bed for 14 days and then, if she feels better, she can go back to normal activities.  Dr. Janese testified that if the person still has pain, he would perform a surgical decompression.  He said that this record does not reflect that any of those things were done that are consistent with a finding of radiculopathy.  (Tr. 94).  He stated that the normal physical examinations over a five- to six-year period were the important thing and that plaintiff does not have radiculopathy.  (Tr. 94-95).

Dr. Janese testified that the MRI report of Boyd's cervical spine (Exhibit 6F-19, Tr. 655 dated April 23, 2010) contains findings of foraminal[17] narrowing and facet

---

[17]The intervertebral foramen are "any of the openings that give passage to the spinal nerves from the vertebral canal . . . in the pedicles of contiguous vertebrae."  Medline Plus Medical Dictionary (Merriam-Webster, Inc. 2015), http://www.merriam-webster.com/medlineplus/foramen.

arthropathy.[18]  He stated that findings like these on radiographic or MRI tests are normal in patients in their 40s and 50s, unless corroborated by physical examination.  (Tr. 95-96).  He said that a radiologist usually reports such findings as consistent with a patient's age, although the radiologist did not do so in this instance.  He opined that mild, bilateral neuroforaminal narrowing at C5-6, as reported on Exhibit 6F, is either consistent with the patient's age or not a significant finding.  (Tr. 96).

Dr. Janese testified that an osteophyte is essentially a bone spur that develops over time after a minor injury when the body has repaired itself and an osteophyte complex is a juxtaposition of one or two of these bone spurs.  He stated that osteophytes are usually not significant unless they cause a specific problem that can be pinpointed to that osteophyte complex.

Dr. Janese testified that a facet is similar to a diamond with a flat surface.  He said that the back contains flat, smooth, shiny facet joints and that degenerative changes in these joints are called facet arthropathy.  He stated that facet arthropathy can cause pain and is the primary cause of back pain for most people, but that it responds to treatment with nonsteroidal anti-inflammatory medications, rest and application of topical methyl

---

[18]The facet joints at the back of the spine connect the vertebral bodies to each other and counterbalance the intervertebral discs.  The facet joints help keep the normal alignment of the spinal vertebrae and limit motion.  Pain and discomfort caused by degeneration and arthritis of this part of the spine is called facet arthropathy, which simply means a disease or abnormality of the facet joints.  Back.com (Medtronic 2015), http://www.back.com/back-pain/conditions/back-arthritis (visited on July 13, 2015).

salicylate. (Tr. 97). He testified that this type of pain can get better with rest alone and that many backaches feel better after eight hours of supine posture and rest.

As to the lumbar MRI performed on April 22, 2010 (Exhibit 6F, Tr. 653), which showed moderate foraminal narrowing, Dr. Janese testified that he had previously clarified that he did not mean that all of the imaging findings are normal, but that, based on plaintiff's physical examinations, the imaging findings are not significant. (Tr. 99).

Dr. Janese stated that Boyd had a temporary column stimulator in October 2010 and then a permanent stimulator implanted in March 2011, and she did well after the surgery. (Tr. 100-01). He testified that he personally has seen and the literature shows that the efficacy of column stimulators is not very high. He said that Dr. Jolly put in the temporary stimulator and, after Dr. Jolly thought it was efficacious, Dr. Katz put in a permanent one with a subdermal battery. Dr. Janese said he would not recommend dorsal column stimulators. (Tr. 101).

Dr. Janese testified that he is a board-certified neurosurgeon and that he does not see any neurosurgery reports in the record. He did not know if Dr. Katz is a neurosurgeon or a pain doctor. He opined that "the validity of these findings is not very good." (Tr. 103). He stated that his longitudinal review of the records indicates that there is one neurologist and a pain doctor and perhaps a physiatrist who put in the dorsal column stimulators, and that perhaps the difference in his specialty leads to the difference in opinion. (Tr. 103-04).

27

Jack W. Heidenreich, M.D., testified by telephone from his office.  He stated that he has practiced family medicine for 22 years in Matthews, Louisiana.  (Tr. 107).  He said he has treated Boyd since before 2008 and is still her primary treating physician.  He stated that his diagnoses since 2008 have been chronic depression, fibromyalgia, chronic low back pain and obesity, and that plaintiff has some sleep apnea issues, hypertension and high cholesterol.  (Tr. 108).

Dr. Heidenreich testified that fibromyalgia and low back pain are conditions that cause pain.  He stated that he only had plaintiff's most recent records in front of him, but that he knows her and her medical history fairly well.  (Tr. 109-10).  When asked to describe her condition in 2008 and 2009, he said he had sent her to neurology and neurosurgery specialists to see if she was a candidate for back surgery.

Dr. Heidenreich stated that he started seeing Boyd about 10 years ago, when she had a chronic pain condition that he eventually diagnosed as fibromyalgia and depression.  He testified that her level of functioning slowly declined over that period and that her pain has been frustratingly difficult to control.  He said he had used all the medications he could think of and had sent her to pain management for additional help.  (Tr. 110-11).  He stated that plaintiff does not like to take strong medication.  He said she

28

had tried Seroquel, Neurontin[19] and Lyrica[20] that he prescribed in consultation with a neurologist and a pain management doctor, but that nothing had controlled her pain very well.  He testified that she tried a nerve stimulator at one time, but it only helped her a little, so he gave that up.

Dr. Heidenreich said that Boyd has depression and insomnia and takes Pristiq, an antidepressant, and Seroquel at night to help her sleep.  He stated that she does not sleep well, which is related to her fibromyalgia.  He testified that he diagnosed her with sleep apnea and that she tried to use a CPAP machine, but she could not tolerate it and gave it up because it made her sleep worse.  He stated that her current level of functioning is that she hurts all the time and it is difficult for her to get up and do anything.  (Tr. 111).

The ALJ explained to Dr. Heidenreich that plaintiff alleges that she became unable to work on December 26, 2008; that she was covered for DIB only until June 30, 2009; and that the evidence must establish that she was disabled before that date for her to succeed on her claim.  (Tr. 112).  Dr. Heidenreich stated that he was testifying from memory regarding that time period and that Boyd is "pretty much the same now as she was five years ago."  He stated that, when he said that her condition has declined during

---

[19]Neurontin (generic name: gabapentin) is used to help relieve certain types of nerve pain. PDRhealth, http://www.pdrhealth.com/drugs/neurontin (visited July 13, 2015).

[20]Lyrica (generic name: pregabalin) is "used to treat seizures, pain from damaged nerves (neuropathic pain) that occur from diabetes and shingles (painful rash caused by chickenpox virus), and fibromyalgia (widespread muscle pain)."  PDRhealth, http://www.pdrhealth.com/drugs/lyrica (visited July 13, 2015).

that period, he refers to the pain level that she had then.  He testified that he did not think she was capable of working at that time and that she is worse now, especially with respect to her depression.  He stated that nothing has gotten better for her over the past five years.  (Tr. 113).

Dr. Heidenreich testified that he has been plaintiff's doctor since 2000 and that she had complied with his treatment recommendations to the best of her financial ability.  He said that she is one of the few patients who does not in any way appear to be malingering or not credible.  (Tr. 114-15).

The ALJ decided to continue the hearing so that Dr. Heidenreich could review his older records and opine more accurately as to when and why plaintiff became disabled.  Dr. Heidenreich and plaintiff's attorney agreed to this procedure.  (Tr. 115-16).

Boyd then testified that, when she last worked in 2008, she was an unlicensed caregiver working for Gulf Coast Teaching Services.  She said she quit working because her back pain and fibromyalgia were getting worse and she could no longer bend and stand as needed for the job.  She stated that she had been treated by Dr. Heidenreich for her complaints before that date.  (Tr. 118).  Plaintiff said she was mentally drained and overwhelmed at that time and she secluded herself in her bedroom for two to three days and just cried.  She testified that she was miserable, uncomfortable and in such pain that sometimes she felt like giving up.  She said she still has bad pain.

Boyd stated that her ability to sleep is worse now than when she quit working, but that she had problems sleeping back then and could only sleep four to five hours per night because of pain in her lower back, down her legs and in her left shoulder. (Tr. 119-20). She testified that Dr. Heidenreich gave her antidepressants when she stopped working. She said that Pristiq helps now, but she sometimes gets depressed for two or three days because she cannot use parts of her body like she used to do. (Tr. 120).

### 4.   The fifth hearing on January 30, 2014

The ALJ reconvened the hearing for additional testimony from Dr. Heidenreich to clarify his prior, inconsistent testimony that Boyd's condition had both declined over time and is now about the same as it was in 2008. (Tr. 41). The ALJ stated that, when testifying previously, Dr. Heidenreich had not reviewed his records from the 2008-2009 time period, but had relied on his memory of his treatment of Boyd. The ALJ said that he had continued the hearing so the physician could review his earlier records. (Tr. 42).

Dr. Heidenreich, testifying by telephone, confirmed that plaintiff's attorney had sent him a copy of his earlier records from the administrative record. The ALJ told Dr. Heidenreich that a psychiatrist had reviewed the records and had testified at the prior hearing that Boyd met a listing for mental disorders and was disabled as of April 11, 2011, but that this finding did not help her because she was not insured for DIB after June 30, 2009. (Tr. 43). The ALJ summarized the testimony of the neurologist at the prior hearing, who had opined that Boyd did not meet any listing and that the medical

31

records did not establish anything that made her disabled.  (Tr. 43-44).  The ALJ advised

Dr. Heidenreich that his testimony regarding Boyd's condition in 2008 would be critical

to the ALJ's decision whether plaintiff was disabled and when she became so.  (Tr. 44).

Dr. Heidenreich summarized his medical records as follows.  He last saw plaintiff

in December 2013, when she complained of trigger point pain[21] in her shoulders, neck,

lumbar region and thighs.  She reported numbness in her legs when she stands, poor sleep

at night and daytime fatigue.  On physical examination, she had trigger point pain when

those areas were pressed, as she had in the past.  Dr. Heidenreich compared this report

to his notes from December 2008.  He stated that Boyd had the same complaints at that

time of insomnia, daytime fatigue, neck pain, constant back pain and trigger point pain,

all consistent with fibromyalgia.  He stated that plaintiff also saw Dr. Cowen, a

physiatrist,[22] at that time and that Dr. Cowen had a similar impression.

Dr. Heidenreich testified that he was asked on November 18, 2010, "to fill out [a

form regarding] what [Boyd] could do work wise."[23]  He said that "she pretty much

---

[21]Point tenderness must be found in at least 11 of 18 specified sites as a diagnostic sign of fibromyalgia.  Stedmans Medical Dictionary, on Westlaw at STEDMANS 331870.

[22]The transcript incorrectly says that Dr. Heidenreich testified that Dr. Cowen is a "podiatrist."  Dr. Cowen is actually a physiatrist, which is a medical doctor who specializes in physical medicine and rehabilitation.  Id. at STEDMANS 687700; American Academy of Physical Medicine and Rehabilitation, https://www.aapmr.org/patients/aboutpmr/Pages/default.aspx (visited July 14, 2015).

[23]Dr. Heidenreich's testimony that this was on November 18, 2010, seems to be mistaken.  The Medical Source Statement that he completed has a handwritten date of **1/**18/2010.  (Tr. 542).  Dr. Heidenreich appears to have misread the "1/" as an "11," thus stating the month as November.  However, the date of the form is actually January 18, 2010, the same date when his progress notes of plaintiff's visit state:  "Needs form filled out."  (Tr. 544).

stayed in bed . . . because of her chronic pain and fatigue." He opined that "she'd have a very difficult time completing an eight-hour work day with that." (Tr. 45). He testified that Boyd's symptoms were the same in November 2008 as they are now and that she has not improved[24] over this time period. (Tr. 45-46). He said that she has "tried nerve stimulators, things like that which have helped."

Dr. Heidenreich said that it is difficult to measure objectively whether Boyd is worse now because he is not a physiatrist[25] who can perform objective work studies, but that her condition has been the same from 2008 to the present. He testified that he has never written down a numeric scale for her pain level, but that her complaint of pain was the same. Dr. Heidenreich stated that he recalls that plaintiff would have bad weeks and better weeks. He noted that chronic pain from fibromyalgia is subjective and it is difficult to assign a number to it. He said that Boyd's condition was severe enough that she was willing to try a nerve stimulator and other modalities to seek help. He reiterated that her pain level has been the same from 2008 through 2014. (Tr. 46).

---

[24]According to the transcript, Dr. Heidenreich testified that "she hasn't – she certainly has an accrued, I guess, over this period of time." This makes no sense. Because Dr. Heidenreich began this sentence with "she hasn't" and because he testified at the previous hearing that Boyd has not gotten better, I have interpreted this sentence as "she certainly hasn't improved."

[25]Again, this was mis-transcribed as "podiatrist."

Dr. Heidenreich stated that Boyd has been compliant with his treatment recommendations.  He said he had reviewed the records from Drs. Jolly and Cowen and that their findings were consistent with his own.  (Tr. 47).

C.     Vocational Expert Testimony

A vocational expert, Patricia Riggle, testified at the fourth hearing[26] that plaintiff's work as a stock clerk is classified as heavy by the Dictionary of Occupational Titles, but that Boyd actually performed it as a semi-skilled, medium job.  Riggle stated that Boyd's past work as a caregiver was semi-skilled and medium.  (Tr. 121).

The ALJ posed a hypothetical of a person who can do medium work, as Dr. Janese testified.  Riggle testified that such a person could perform both of plaintiff's past relevant jobs, as Boyd actually performed them.

The ALJ then posited an individual who, before June 30, 2009, could perform work at the light exertional level, lift and carry a maximum of 20 pounds occasionally and 10 pounds frequently, stand and/or walk up to six hours in an eight-hour day, stoop occasionally and grasp and hold objects.  Riggle testified that such a person could not perform any of Boyd's past relevant work.  (Tr. 122).  She testified that a person with plaintiff's age and education and that residual functional capacity could perform jobs

---

[26]Although vocational experts also testified at the first and second hearings, the ALJ did not rely on their testimony for the decision that is on appeal to this court.  Accordingly, I have not summarized the earlier vocational expert testimony.

available in the national or regional economy, such as cashier, retail sales person and greeting customer service representative. (Tr. 123).

The ALJ posed a third hypothetical of the same person with additional limitations in maintaining attention and concentration for extended periods and in completing work tasks in normal work day at a consistent pace, and who, due to pain and/or side effects of medications, would be unable to perform at an optimum level of performance for up to one-fourth of the work day, but at no time would be precluded entirely from working. (Tr. 123-24). Riggle testified that this person could perform the same three jobs.

The ALJ posed a fourth hypothetical in which an individual with the same age and education is limited to sedentary work, can lift and carry a maximum of ten pounds, walk and stand no more than two hours in an eight-hour day, sit for six or more hours in an eight-hour day, and has difficulty maintaining attention and concentration for extended periods and in completing work tasks in a normal work day at a consistent pace. Riggle stated that such a person could perform available jobs, such as cashier, customer service representative, and receptionist and information clerk. (Tr. 124).

The ALJ posed a fourth hypothetical in which an individual with the same age and education is limited to sedentary work; can use short-term memory; can understand, remember and carry out simple instructions, both written and oral; can engage in one- and two-step processes; and has the same limitations in concentration and pace as in the previous hypothetical. (Tr. 124-25). Riggle testified that such a person could perform

35

available, unskilled jobs, such as information clerk, general office clerk and bookkeeping clerk.  (Tr. 125).

Plaintiff's attorney proposed a hypothetical of a person of the same age, education and vocational experience as described by the ALJ, but who can only stand for a total of one hour during an eight-hour day and for only 15 minutes continuously; can only sit for one hour total and only 30 minutes continuously; requires rest for pain management for up to four hours in an eight-hour day; can lift only five pounds occasionally; can reach overhead occasionally with either arm; and should not balance, crawl, bend, stoop, kneel, climb or be exposed to moving machinery or heights.  (Tr. 125-26).  The vocational expert said that such a person would not be able to perform any work.  (Tr. 126-27).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 19-27).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ applied the appropriate legal standards in weighing the opinions of plaintiff's treating primary care physician

Boyd alleges disability beginning on December 26, 2008.  To succeed on her claim, she must establish that she was disabled before her last insured date of June 30,

36

2009.  The ALJ held at the fifth step of the sequential evaluation that Boyd is not disabled because jobs are available that she has the residual functional capacity to perform.  Plaintiff argues that the ALJ erred by giving little weight to the opinions of her treating physician, Dr. Heidenreich; failing to analyze Dr. Heidenreich's opinions in light of the factors in 20 C.F.R. § 404.1527, as required by Newton v. Apfel, 209 F.3d 448 (5th Cir. 2000); granting great weight to the opinions of non-examining Drs. Janese and Dusay; and relying in part on the residual functional capacity assessment completed by Charles Lee, M.D., on April 14, 2009, based solely on his review of the medical records, in which he opined that Boyd can perform light work with no climbing of ladders, ropes and scaffolds, and only occasional climbing of ramps or stairs, stooping, kneeling, crouching and crawling.  (Tr. 531-38).

Dr. Heidenreich has treated Boyd since before her alleged onset date.  On January 18, 2010, more than six months after her date last insured, he completed a form Medical Source Statement at her request.  He checked off boxes and circled time limits in response to preprinted questions on the form, opining that she has severe limitations in various aspects of physical functional capacity.  Dr. Heidenreich based his opinions on

plaintiff's diagnosed fibromyalgia, neuropathy[27] and lumbago.[28] He indicated that Boyd is unable to stand and/or walk for more than one hour total in an eight-hour work day, sit for more than one hour total in an eight-hour work day or lift more than five pounds, and that she must rest for more than four hours during an eight-hour work day and be able to elevate both legs at will.  He stated that these restrictions existed at least since December 26, 2008. (Tr. 540-42).

The ALJ afforded "little weight" to Dr. Heidenreich's opinions on the Medical Source Statement because they "are not supported by objective medical evidence of record, but rather appear to be based upon claimant's subjective complaints."  (Tr. 28). The ALJ gave "some weight to the findings" in Dr. Heidenreich's contemporaneous medical records for the relevant period "to the extent they were based upon objective evidence.  Dr. Heidenreich's testimony was rather equivocal and thus is given only some weight as well."  Id.

Plaintiff contends that the ALJ improperly failed to explain which parts of Dr. Heidenreich's opinions were given "some weight" or what the ALJ meant by "some weight."  She argues that, contrary to the ALJ's reasoning, her subjective complaints and

---

[27]Neuropathy is:  "1. A classical term for any disorder affecting any segment of the nervous system.  2. In contemporary usage, a disease involving the cranial nerves or the peripheral or autonomic nervous system."  Stedmans Medical Dictionary, available on Westlaw at STEDMANS 272690.

[28]Lumbago is a descriptive term, not specifying the cause, for pain in the mid- and lower back. Id. at STEDMANS 514330.

her diagnoses of chronic pain and fibromyalgia are supported by objective evidence, including MRI and EMG test results in 2008 and 2010, lab tests by Dr. Schweitzer in March 2010, and findings of limitation of motion, gait abnormality and tender points on physical examination.  She asserts that Dr. Heidenreich's opinions are consistent with those of Dr. Cowen, the physiatrist who saw her three times in August and September 2008 and ordered a lumbar spine MRI and performed an EMG in September 2008 (Tr. 523-30); Dr. Huddleston, her treating neurologist since February 4, 2010 (Tr. 644-46); and Dr. Jolly, a pain management specialist who began treating Boyd on September 15, 2010 (Tr. 682-85), and recommended treatment with a spinal column stimulator, which was implanted by Ralph P. Katz, M.D. on March 1, 2011.  (Tr. 718).  As to the "great weight" that the ALJ afforded to the opinions of Dr. Janese (Tr. 29), the neurosurgeon who testified based on his review of her medical records, Boyd argues that Dr. Janese's opinions are not entitled to such weight because they are unsupported by the medical evidence and inconsistent with the opinions of every one of her treating physicians.

Generally,

[t]he opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.  The opinion of a specialist generally is accorded greater weight than that of a non-specialist.

Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  <u>The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is shown</u>.  Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

<u>Newton</u>, 209 F.3d at 455-56 (quotations and citations omitted) (emphasis added).

Boyd cites the Fifth Circuit's holding in <u>Newton</u> "that, absent reliable medical evidence from a <u>treating or examining physician controverting the claimant's treating specialist</u>, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  <u>Id.</u> at 453 (emphasis added); <u>see also</u> <u>Thibodeaux v. Astrue</u>, 324 F. App'x 440, 445 (5th Cir. 2009) (citing <u>Newton</u>, 209 F.3d at 453, 456) (When the record contained "reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, . . . the ALJ was <u>not</u> required to apply the criteria set forth in 20 C.F.R. § 404.1527(d)(2).") (emphasis added).

The criteria in 20 C.F.R. § 404.1527(d)(2) are (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the

record as a whole and (6) the specialization of the treating physician.  Newton, 209 F.3d at 456.  Boyd argues that the ALJ failed to analyze these criteria as required when he rejected Dr. Heidenreich's opinions in favor of those of Dr. Janese.

The medical evidence in the instant case is extremely voluminous (the entire record exceeds 1,000 pages) but, as the ALJ stated, most of the records were created long after the relevant period of December 26, 2008, through June 30, 2009.  The ALJ nonetheless thoroughly reviewed and considered all of the medical evidence, affording the greatest weight to the contemporaneous records before and for a short time after June 30, 2009, which could reasonably be expected to relate to Boyd's condition during the relevant period.

The ALJ stated that he evaluated the opinion evidence in accordance with 20 C.F.R. § 404.1527 and the related Social Security Rulings.  (Tr. 21).  In his summary of the medical records, the ALJ acknowledged Dr. Heidenreich's length of treatment, frequency of examination and the nature and extent of his treatment relationship with Boyd.  The ALJ specifically discussed the support of Dr. Heidenreich's opinions by the medical evidence of record and the consistency of the opinions with the record as a whole, focusing on the relevant time period of 2008 through 2009.  The only one of the six factors that the ALJ did not address specifically in his lengthy decision was that Dr. Heidenreich is a practitioner of family medicine.  However, the ALJ repeatedly noted that Dr. Heidenreich was plaintiff's primary care physician and that she did not see a

neurologist or pain management specialist until 2010. Dr. Heidenreich's lack of specialization actually supports the ALJ's grant of more weight to the opinions of Dr. Janese, a neurosurgeon. Thus, the ALJ's procedural failure to discuss this factor does not prejudice Boyd. Alexander v. Astrue, 412 F. App'x 719, 722 (5th Cir. 2011); Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007). The ALJ met his obligation to discuss the Newton factors in his decision.

Based on the medical records and testimony, the ALJ accepted the diagnoses of Drs. Heidenreich and Huddleston and found that plaintiff had severe impairments consisting of degenerative disc disease of the lumbar spine, fibromyalgia and obesity through her date last insured. The ALJ discounted the opinions of these doctors regarding plaintiff's symptoms and functional abilities to the extent that the opinions are based primarily on her subjective complaints and not supported by the contemporaneous treatment records, including objective tests and physical examinations.

As to Dr. Huddleston, the ALJ afforded some, but not great, weight to her opinions because she did not begin treating plaintiff until more than seven months after Boyd's last insured date. The ALJ also gave less weight to Dr. Huddleston's opinions because, he stated, she generally found nothing remarkable during physical examinations and did not identify any of plaintiff's functional limitations specifically. The ALJ's finding that Dr. Huddleston's physical examinations of Boyd were essentially normal is supported

by substantial evidence in her progress notes.  <u>See, e.g.</u>, Tr. 645 (February 4, 2010), 642 (February 25, 2010), 639 (May 4, 2010), 666 (August 3, 2010).

Boyd argues that the ALJ should have granted more weight to Dr. Huddleston's opinion on January 29, 2013, more than three years after plaintiff's last insured date, that "she isn't able to return to prior employment due to pain."  (Tr. Tr. 882).  The first time that Dr. Huddleston made a similar statement was on December 16, 2011, more than two years after Boyd's last insured date.  (Tr. 886).  The ALJ had good cause to disregard these opinions, which did not relate to the relevant time period and did not cite any specific functional limitations.

In addition, it is well established that a physician's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act, because that is a determination that may be made only by the Commissioner.  <u>Miller v. Barnhart</u>, 211 F. App'x 303, 305 (5th Cir. 2006) (citing <u>Frank v. Barnhart</u>, 326 F.3d 618, 620 (5th Cir. 2003)); <u>Chambliss v. Massanari</u>, 269 F.3d 520, 522 (5th Cir. 2001); <u>Tamez v. Sullivan</u>, 888 F.2d 334, 336 n.1 (5th Cir. 1989).  The ALJ was not required to accept either Dr. Huddleston's or Dr. Heidenreich's opinions that Boyd cannot work.

As to Dr. Heidenreich's Medical Source Statement, good cause exists for the ALJ to give it little weight.  The ALJ specifically discussed his reasons for that weight.  The ALJ noted that the Medical Source Statement was completed more than six months after Boyd's date last insured, making it less relevant than Dr. Heidenreich's earlier treatment

records.  Although Dr. Heidenreich opined in the Medical Source Statement that the extreme restrictions on Boyd's functioning had existed since her alleged onset date of December 26, 2008, the ALJ found that the contemporaneous treatment records did not support those limitations.

The ALJ also mentioned that Dr. Heidenreich' notes show that plaintiff regularly failed to take medications as prescribed, that her symptoms waxed and waned during the course of her treatment, that she provided conflicting information to Dr. Heidenreich and his nurse at times, and that she did not follow recommendations to lose weight and undergo a sleep study.  (Tr. 23-24).  A claimant's lack of need for strong medication or a failure to seek treatment are relevant factors to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Clayborne v. Astrue, 260 F. App'x 735, 737 (2008); Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Bryan v. Halter, 252 F.3d 1357, 2001 WL 422878, at *2 (5th Cir. Apr. 5, 2001) (citing 20 C.F.R. §§ 404.1530, 416.930; Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991)); Austin v. Apfel,  205 F.3d 1338, 1999 WL 1338401, at *1 (5th Cir. 1999) (citing Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991)).  The record as a whole substantially supports the ALJ's reasons for not granting controlling weight to Dr. Heidenreich's opinions on the Medical Source Statement.

Dr. Janese testified that plaintiff's physical examination findings were essentially normal throughout her treatment. Substantial record evidence supports this testimony. See, e.g., Dr. Cowen's notes dated August 27, 2008 (Tr. 529); Dr. Heidenreich's notes dated July 28, 2008 (Tr. 610), October 27, 2008 (Tr. 601), December 17, 2008 (Tr. 597); Dr. Huddleston's notes cited above; Dr. Schweitzer's notes dated March 7, 2010 (Tr. 635-36; Boyd walked with a cane, but her physical examination was normal). The remainder of Dr. Cowen's and Dr. Heidenreich's notes during the relevant time period generally do not record any physical examination of plaintiff's lower back and legs. As the ALJ stated, Dr. Heidenreich noted Boyd's subjective complaints and, on occasion, the presence of trigger point pain.

Boyd claims that findings on physical examination of limitation of motion, gait abnormality and tender points are objective evidence of her condition that support Dr. Heidenreich's opinions. However, these are not substantially confirmed by the record. First, Dr. Janese testified that gait abnormality is a subjective finding based on pain, not an objective finding, as plaintiff asserts. Even if it were an objective finding, her treating physicians did not document any antalgic gait until October 22, 2009, almost four months after Boyd's date last insured. (Tr. 560). The records both before and after that date contain numerous notations that her gait was unremarkable.

Second, pain on physical examination is also subjective, as Drs. Dusay, Janese and Heidenreich testified, not an objective finding. "While pain can be disabling, it is not an

45

automatic ground for entitlement to disability benefits.  Pain is recognized as a disabling condition under the Act only where it is constant, unremitting, and wholly unresponsive to therapeutic treatment.  The test for disability under the Act is not satisfied merely because Plaintiff cannot work without some pain or discomfort." Alvarez v. Colvin, No. 3:12-CV-03569-BK, 2013 WL 1858197, at *7 (N.D. Tex. May 3, 2013) (citing Hames, 707 F.2d at 166); accord Nugent v. Astrue, 278 F. App'x 423, 427 (5th Cir. 2008) (citing Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985)); Beck v. Barnhart, 205 F. App'x 207, 212 (5th Cir. 2006) (citing Cook, 750 F.2d at 395); Chambliss, 269 F.3d at 522; Selders, 914 F.2d at 618.

Subjective complaints of pain or other symptoms must be corroborated by objective medical evidence, Quijas v. Astrue, 298 F. App'x 391, 393 (5th Cir. 2008) (citing Chambliss , 269 F.3d at 522); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989), and such complaints may be discounted when the alleged symptoms are not consistent with the objective medical evidence.  Brown v. Astrue, 344 F. App'x 16, 21 (5th Cir. 2009); Hernandez v. Astrue, 278 F. App'x 333, 340 (5th Cir. 2008); Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

Third, even if limitation of motion is an objective finding, the medical records do not document any limitation of motion until plaintiff saw Dr. Jolly, a pain specialist, on September 15, 2010, more than 14 months after her date last insured.  At that time, Boyd had full range of motion in both lower extremities, but had joint tenderness and limited

range of motion in her lower back. (Tr. 684). At subsequent visits to Dr. Jolly, Boyd had decreased lumbar motion, but negative straight leg raising tests. (Tr. 675, 679). Dr. Janese testified that a patient with radiculopathy, which was diagnosed by Drs. Cowen and Huddleston, would have a positive straight leg raising test, and Dr. Janese disagreed that Boyd has radiculopathy. (Tr. 86-87). Dr. Huddleston noted on December 3, 2010, more than 16 months after plaintiff's date last insured, that Boyd had decreased range of motion in her left shoulder, which Dr. Huddleston felt might reflect a new orthopedic injury. (Tr. 671). Dr. Jolly noted on April 6, 2011, more than 21 months after plaintiff's date last insured, that she had a positive straight leg raising test and an antalgic gait. (Tr. 697).

Even if Boyd had documented findings of limitation of motion, gait abnormality and tender trigger points during the relevant time period, the mere presence of such subjective findings or of abnormalities on objective testing, such as EMGs and MRIs, and the mere diagnosis of any condition do not establish disability. Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431(5th Cir. 2006); Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Martin

v. Chater, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)).

Plaintiff "'must show that she was so functionally impaired [by her impairments] that she was precluded from engaging in any substantial gainful activity.'" Bordelon, 281 F. App'x at 422 (quoting Hames, 707 F.2d at 165); accord Taylor v. Astrue, 706 F.3d 600, 603 (5th Cir. 2012); Randall v. Astrue, 570 F.3d 651, 658-59 (5th Cir. 2009); Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992); Hamauei v. Astrue, No. 10-85, 2011 WL 802398, at *7 (E.D. La. Feb. 28, 2011) (quoting Hames, 707 F.2d at 165).

The ALJ's statement that Dr. Heidenreich's testimony was "rather equivocal" and the ALJ's decision to afford the testimony only some weight is substantially supported by the record.  Dr. Heidenreich testified at the fourth hearing in November 2013 that plaintiff's level of functioning slowly declined during the time that he treated her.  Only after the ALJ explained to him that Boyd must establish that she was disabled before June 30, 2009, did Dr. Heidenreich state that plaintiff is "pretty much the same now" as she was five years ago.  The doctor confusingly tried to explain that when he said that her condition has declined during that period, he referred to the pain level that she had then.  He testified that he did not think she was capable of working at that time, but again said that she is worse now, especially with respect to her depression.  Based on these inconsistencies in Dr. Heidenreich's testimony, the ALJ continued the hearing to allow the physician to review his earlier records.

At the fifth hearing in January 2014, after Dr. Heidenreich reviewed his treatment notes and had been told again by the ALJ that his testimony regarding Boyd's condition in 2008 would be critical to the ALJ's decision whether she was disabled before her last insured date, the doctor testified that Boyd's symptoms were the same in November 2008 as they are now. He stated that it is difficult to be objective in measuring whether Boyd is worse now, but he said that her condition has been the same from 2008 to the present. He testified that he never wrote down a numeric scale for her pain, but that the complaint of pain was the same. Dr. Heidenreich stated that plaintiff would have bad weeks and better weeks.

The ALJ afforded some weight to Dr. Heidenreich's testimony in that the ALJ accepted the diagnoses of fibromyalgia, degenerative disc disease and obesity as severe impairments and noted that Boyd's symptoms waxed and waned during the relevant time period. Although Dr. Janese opined that plaintiff could perform medium work, the ALJ did not accept Dr. Janese's opinion in that regard. The ALJ found that Boyd is capable of light work with the limitation that she may stoop only occasionally. The ALJ's residual functional capacity assessment is based in part on Dr. Lee's residual functional capacity assessment for light work with a few additional postural restrictions and in part on Dr. Heidenreich's opinions to the extent they were supported by the objective medical evidence. Based on the entire record, the ALJ's evaluation was more restrictive than Dr. Janese's assessment and less restrictive than Dr. Lee's assessment.

49

The ALJ evaluated the credibility of the witnesses and resolved conflicts in the evidence, as he is required to do. "The ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'" Ramirez v. Colvin, No. 14-20563, 2015 WL 1607346, at *4 (5th Cir. Apr. 10, 2015) (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); accord Yates v. Colvin, No. 14-41183, 2015 WL 1516115, at *3 (5th Cir. Apr. 6, 2015) (citing Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994)).

"[T]he ALJ may disregard the treating physician's opinions if 'he finds, with support in the record, that the physician is not credible and is leaning over backwards to support the application for disability benefits.'" Thompson v. Astrue, 232 F. App'x 421, 424 (5th Cir. 2007) (quoting Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)). Instead, the ALJ did not find that Dr. Heidenreich's opinions were not credible, but he found that the opinions were not substantially supported by treatment notes and objective findings from the relevant time period, and that the doctor's testimony was "equivocal."

When good cause exists, the ALJ is entitled to find that a non-examining doctor's opinions are more credible and well supported than those of a treating physician. See Byrd v. Comm'r of Social Sec., 368 F. App'x 542, 543 (5th Cir. 2010) (quoting Perez, 415 F.3d at 461) ("Though the ALJ appears to have given less weight to the treating physician's opinions than to those of the medical expert called at the hearing, '[c]onflicts of evidence are for the Commissioner, not the courts, to resolve.'"); Eggins v. Astrue,

50

351 F. App'x 909, 910-11 (5th Cir. 2009) (The ALJ's conclusion that none of plaintiff's treating physicians supported their opinions regarding her allegedly disabling symptoms with objective medical findings was supported by substantial evidence.  The ALJ was not required to give these opinions substantial weight when plaintiff's medical history presented numerous contradictory findings, even though there was no contradictory medical expert testimony.); Masterson, 309 F.3d at 273 (The ALJ appropriately relied on non-examining medical expert's opinion that plaintiff did not have post-traumatic stress disorder, which conflicted with evidence from plaintiff's treating sources and with plaintiff's testimony, which the ALJ found not credible.  The ALJ has the responsibility to resolve conflicting medical opinions and credibility questions.).

In the instant case, the ALJ thoroughly discussed the medical evidence and resolved any conflicts in favor of the opinions of Drs. Janese and Dusay that Boyd did not have functional limitations that rendered her disabled before June 30, 2009.  Unlike her treating doctors, the testifying expert physicians had reviewed the entire medical record and focused on evidence from the relevant time period.  "[T]he Act empowers the ALJ to analyze the physicians' testimony.  Substantial evidence supports the ALJ's decision to disregard the [treating] physicians' conclusions [and rely in part on a non-examining physician's report].  That basis is enough to survive our review." Greenspan, 38 F.3d at 237.

Accordingly, this assignment of error lacks merit.

51

2.    The ALJ's residual functional capacity findings are supported by
      substantial evidence.

The ALJ determined plaintiff's residual functional capacity at the fourth step of the sequential evaluation.  In this assignment of error, Boyd again argues that the ALJ erred by affording little weight to the opinions of her treating physicians and by giving significant weight to non-examining doctors' opinions.  As discussed in the preceding section, the ALJ applied the appropriate legal standards in evaluating the medical evidence and substantial evidence supports his determination of the weight afforded to each opinion.  The court will not discuss this evidence again.

Plaintiff also contends that the ALJ erred by relying in part on Dr. Lee's residual functional capacity assessment for light work with some postural limitations dated April 14, 2009, because Dr. Lee did not examine her and because his opinion was based solely on Dr. Cowen's records from 2008 and was rendered almost five years before the ALJ's decision.  As discussed in the preceding section, a medical expert's lack of examination of a claimant does not render the expert's opinion irrelevant or unsupported. Indeed, the ALJ is required to consider the opinions of consultants like Dr. Lee who reviewed the medical evidence at the initial agency level.

"State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation."  20 C.F.R. § 404.1527(f)(2)(i).

"Although ALJs are not bound by any findings made by State agency medical or psychological consultants, they must consider such findings as opinion evidence." Alejandro v. Barnhart, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003) (quotation omitted) (citing 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i)); accord Glass v. Barnhart, 158 F. App'x 530, 532 (5th Cir. 2005) (citing 20 C.F.R. 404.1527(f)(2)(iii); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990)); Butler v. Barnhart, 99 F. App'x 559, 560 (5th Cir. 2004) (citing 20 C.F.R. §§ 404.1527(f)(2)(i)).

As previously discussed, plaintiff must establish that she was disabled before June 30, 2009, and only the medical records from before and shortly after that date are relevant. While Dr. Lee did not have the benefit of Dr. Heidenreich's records from before April 14, 2009, or plaintiff's other medical records after her date last insured, the two testifying medical experts reviewed all of those records. The ALJ considered the entire record, including plaintiff's testimony at three hearings, Dr. Heidenreich's Medical Source Statement that limited Boyd to less than sedentary work and Dr. Heidenreich's testimony. The ALJ's decision to reject Dr. Heidenreich's opinions regarding plaintiff's functional capacity was substantially supported by the evidence, for the reasons detailed in the preceding section. The ALJ did not entirely accept either Dr. Lee's residual functional capacity assessment for light work with several postural restrictions or Dr. Janese's assessment for medium work. Rather, the ALJ weighed those opinions along with all other relevant evidence and assessed a residual functional capacity for light

53

work, with only occasional stooping, which is less restrictive than Dr. Lee's assessment, but more restrictive than Dr. Janese's.

In making this assessment, the ALJ found that Boyd's statements and testimony regarding her condition before her date last insured were not entirely credible for the reasons stated in his decision.  Determining the credibility of subjective evidence of pain and disability is a necessary part of the ALJ's consideration of the evidence. Luckey v. Astrue, 458 F. App'x 322, 326 (5th Cir. 2011) (citing Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985)); Perez, 415 F.3d at 462.

The ALJ must explain his reasons for rejecting a claimant's subjective complaints, but "he is not required to 'follow formalistic rules in his articulation.'"  Hernandez, 278 F. App'x at 339 (quoting Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)).  The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'"  Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court.  McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (citing Newton, 209 F.3d at 459); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007) (citing  Newton, 209 F.3d at 459).  The ALJ's explanation of his reasons for finding plaintiff not entirely credible is all that is required. Undheim v. Barnhart, 214 F. App'x 448, 450-51 (5th Cir. 2007) (citing 20 C.F.R. §

404.1529(c); Falco, 27 F.3d at 164); James J. Flanagan Stevedores, Inc. v. Gallagher, 219

F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, No.

98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999).

The ALJ in this case discounted the credibility of Boyd's statements based on the

conservative care she received from Dr. Heidenreich before her date last insured,

conflicting information that she provided to various doctors, her noncompliance at times

with her medication regimen, the on-and-off nature of her antalgic gait, her frequently

normal mental status examinations and her failure to seek psychiatric help for depression.

The ALJ also noted that Boyd in 2008 reported only intermittent back pain to Dr. Cowen,

had a normal physical examination and had only mild degenerative disc disease and mild

facet arthropathy on imaging at that time.   (Tr. 27-28).   The ALJ's reasons are

substantially supported by the medical records.

Contrary to plaintiff's argument, the ALJ complied with Social Security Ruling

96-8p, which requires that the ALJ's residual functional capacity assessment must

"[c]ontain a thorough discussion and analysis of the objective medical and other

evidence, including the individual's complaints of pain and other symptoms and . . . must

always consider and address medical source opinions.   If the [residual functional

capacity] assessment conflicts with an opinion from a medical source, the adjudicator

must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).[29]  The ALJ's decision fulfills these requirements.

Accordingly, this assignment of error lacks merit.

### 3.   The ALJ did not violate the Appeals Council's remand order regarding plaintiff's depression.

Boyd argues that the ALJ violated the Appeals Council's remand order and committed an error of law by finding at steps two and three of the sequential evaluation that her depression was not a severe impairment and by failing to provide "actual analysis of plaintiff's symptoms and signs," Record Doc. No. 13 at p. 21, in accordance with the special technique for mental impairments set forth in 20 C.F.R. § 404.1520a.  The Appeals Council noted in its order that plaintiff had been diagnosed with and had testified to subjective depression, but that the ALJ's August 15, 2011, decision had failed to evaluate her mental impairment.  The Appeals Council ordered the ALJ on remand to consider whether Boyd's depression is a severe impairment.  The Appeals Council also directed the ALJ to evaluate plaintiff's mental impairment in accordance with the special technique, providing specific findings and appropriate rationale for each of the four functional areas described in 20 C.F.R. § 404.1520a(c).  (Tr. 226-27).

---

[29]Although the Commissioner's rulings "are not binding on this court, we have consulted them 'when the statute at issue provides little guidance.'"  Bryant v. Astrue, 272 F. App'x 352, 356 (5th Cir. 2008) (quoting Myers v. Apfel, 238 F.3d 617, 620 (5th Cir. 2001)).

The ALJ found at step two of the sequential evaluation that Boyd had symptoms of depression before her alleged onset date, but her mood reportedly improved when she took medication prescribed by Dr. Heidenreich.  The ALJ found no evidence of a formally diagnosed mental affective disorder or that plaintiff had ever sought treatment with a mental health professional before her last insured date.  The ALJ concluded that Boyd's impairment was not severe because the record contained neither medically acceptable clinical findings diagnosing her with depression nor any indication that her depressive symptoms caused work-related limitations for the requisite 12-month period. The ALJ thus complied with the Appeals Council's remand order, which required him to consider whether plaintiff had a severe mental health impairment, but certainly did not require him to find one.

The ALJ also complied with the special technique at the third step of the sequential evaluation.  He found that Boyd's mental impairment was not severe because the evidence, which he thoroughly reviewed and discussed in his decision, demonstrated only mild limitations in her activities of daily living, social functioning and concentration, persistence and pace, and no episodes of decompensation.  These are the four functional areas that 20 C.F.R. § 404.1520a(c) and the Appeals Council's remand order required that ALJ to evaluate.  Pursuant to the special technique, the ALJ therefore held that Boyd's depression was non-severe.  See 20 C.F.R. § 404.1520a(d)(1) ("If we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and

57

'none' in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities."). The ALJ's findings in this regard are substantially supported by the medical evidence. Boyd reported to Dr. Heidenreich in April and May 2009 that her medications helped, her mood had improved and her energy level was better. (Tr. 577, 583). In July 2009, one month after her date last insured, she reported that she was sleeping better and was a little more active. (Tr. 573). Dr. Dusay opined that the medical evidence did not establish that plaintiff's depression was severe enough to be disabling until April 2011, and that her symptoms seemed to wax and wane in 2009. (Tr. 58-59, 72).

In the Fifth Circuit, "[a]n impairment is not severe 'only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902 n.1 (5th Cir. 2010) (quoting Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000)); accord Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985). The ALJ cited the relevant standard and explained why he found that Boyd's mental impairment was not severe.

At the second step of the evaluation, the ALJ determines the "medical severity" of the claimant's medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(ii). When the ALJ has proceeded beyond step two to find at a subsequent step that a claimant

58

is not disabled, plaintiff's argument that the ALJ failed at step two to find that a

particular impairment is severe

> is inapposite because the ALJ did not [deny] plaintiff's benefits based on
> a finding that her impairments are not severe.  See Chapparo v. Bowen, 815
> F.2d 1008, 1011 (5th Cir. 1987) (argument regarding improper application
> of Stone standard irrelevant to disposition of case if outcome of case [did]
> not turn on issue of severity); see also Shipley v. Director of Health and
> Human Services, 812 F.2d 934, 935 (5th Cir. 1987).  The ALJ's report
> contains a statement of the Stone standard and a determination that as it
> applied to this case, [one of claimant's several alleged impairments] is a
> severe impairment. . . .  The ALJ then proceeded to the next step of the
> sequential evaluation and assessed whether an impairment or a combination
> of plaintiff's impairments met or exceeded the severity of the impairments
> listed in the appendix.  See 20 C.F.R. § 404.1594(f)(2).  In the absence of
> a "non-severe" finding as to any one of plaintiff's impairments and a
> decision to [deny] plaintiff's benefits based on a "non-severe" finding,
> plaintiff cannot complain that any prejudice resulted from the ALJ's
> performance at this stage in the evaluation.  See Brock v. Chater, 84 F.3d
> 726, 729 (5th Cir. 1996) (decision will not be reversed where claimant
> makes no showing that she was prejudiced by deficiencies she alleges).

Lawrence v. Barnhart, No. 01-1366, 2002 WL 356316, at *2 (E.D. La. Mar. 4, 2002)

(Vance, J.); see also Taylor, 706 F.3d at 603 ("any error by the ALJ in not following the

procedures set out in Stone [at step two] is harmless" when the ALJ found at step five

that plaintiff was not disabled by his severe impairments); Bradshaw v. Astrue, No. 1:07-

CV-0150-C, 2008 WL 4387087, at *6 (N.D. Tex. Sept. 26, 2008) (citing Robinson v.

Barnhart, 183 F. App'x 451, 455 (5th Cir. 2006); Reyes v. Sullivan, 915 F.2d 151, 154

n.1 (5th Cir. 1990); Chapparo, 815 F.2d at 1011) ("In more recent cases, the Fifth Circuit

has found no merit to claimants' arguments of ALJ error arising out of the failure to

correctly apply or state the <u>Stone</u> standard where the sequential evaluation process proceeds past step 2."); <u>accord</u> <u>Arnett v. Astrue</u>, 676 F.3d 586, 591 (7th Cir. 2012) (citing <u>Castile v. Astrue</u>, 617 F.3d 923, 927-28 (7th Cir. 2010)); <u>Delia v. Comm'r of Soc. Sec.</u>, 433 F. App'x 885, 887 (11th Cir. 2011) (citing <u>Reeves v. Heckler</u>, 734 F.2d 519, 524 (11th Cir. 1984)); <u>Nejat v. Comm'r of Soc. Sec.</u>, 359 F. App'x 574, 577 (6th Cir. 2009) (citing <u>Maziarz v. Sec'y of Health & Human Servs.</u>, 837 F.2d 240, 244 (6th Cir. 1987)).

"Because the ALJ did not summarily dispose of Plaintiff's claims at Step Two, but instead determined that Plaintiff had at least one severe impairment and proceeded to Step Four to determine that Plaintiff was not disabled, the proper focus here is whether substantial evidence supports the ALJ's residual functional capacity (RFC) assessment and ultimate determination that Plaintiff was not disabled." <u>Lavery v. Astrue</u>, No. V-11-3, 2012 WL 3276711, at *5 (S.D. Tex. Aug. 8, 2012) (citing <u>Chaparro</u>, 815 F.2d at 1011) (footnote omitted); <u>accord</u> <u>Arnett</u>, 676 F.3d at 591; <u>Nejat</u>, 359 F. App'x at 577.

Having found that Boyd had other severe impairments, the ALJ proceeded through the subsequent steps of the sequential evaluation, considered all of the evidence concerning her medically determinable impairments and found at the final steps that she was capable as of June 30, 2009, of performing jobs that were available in the national economy. The ALJ's failure to find at step two that Boyd's depression was severe is irrelevant and non-prejudicial to her. Accordingly, this assignment of error is meritless.

###### 4.   The ALJ evaluated the effects of plaintiff's obesity.

The ALJ found at the second step of the sequential evaluation that Boyd had severe impairments consisting of degenerative disc disease of the lumbar spine, fibromyalgia and obesity through her last insured date.  Plaintiff argues that the ALJ violated the Appeals Council's remand order by failing to analyze the effects of her obesity at the third, fourth and fifth steps.  The Appeals Council directed the ALJ on remand to evaluate her obesity in accordance with Social Security Ruling 02-1p. (Tr. 227).

The ALJ did not mention plaintiff's obesity in his discussion at the third step when finding that her impairments did not meet or medically equal any listing.  In his step four analysis of Boyd's residual functional capacity, the ALJ stated that he had assessed the effect of obesity on her ability to perform routine movement and necessary physical activity within the work environment pursuant to SSR 02-1p.  Specifically, he said that the medical records before Boyd's last insured date show that she is five foot five inches tall and weighed 209 pounds.  The records reflected that, although she was diagnosed with obesity, she ambulated without difficulty, and neither the medical records nor her testimony indicated that her obesity exacerbated any of her impairments or particularly limited her activities.  The ALJ nonetheless "[took] into consideration the effect the claimant's weight might logically have on her degenerative disc disease and fibromyalgia in determining [her] residual functional capacity."  (Tr. 27).

Plaintiff argues that the ALJ's statements are not sufficiently specific to satisfy SSR 02-1p, which states that the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  We will evaluate each case based on the information in the case record."  SSR 02-1p, 2002 WL 34686281, at *6 (Sept. 12, 2002).  This Social Security Ruling further provides that an individual with obesity

> may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.  The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected.

Id.  The ALJ necessarily considered these areas of functioning when he specifically assessed plaintiff's residual functional capacity for standing, walking, sitting, lifting, stooping, and grasping, turning and holding objects, as reflected in the credible evidence.

Substantial evidence supports the ALJ's finding that plaintiff's obesity before her last insured date did not significantly exacerbate any of her impairments or limit her activities.  Dr. Cowen's physical examination on August 27, 2008, revealed that Boyd had an unremarkable gait and posture, normal muscle strength, sensation and deep tendon reflexes in her legs.  (Tr. 529).  Dr. Heidenreich's medical records reflect that Boyd had no cyanosis, clubbing or edema and had normal pulses in her legs on July 28 and

December 17, 2008.  (Tr. 597, 610).  She reported that her energy and activity levels were better on May 21 and July 22, 2009. (Tr. 573, 577).  The contemporaneous medical records reflect no limitations in manipulating objects or avoiding environmental hazards.

Plaintiff bears the burden at the first four steps of the sequential analysis to establish that she has functionally disabling impairments.  She has not cited any specific evidence to contradict the ALJ's findings regarding her obesity.  See Harrell v. Colvin, No. 14-55-JJB-RLB, 2015 WL 965745, at *9 (M.D. La. Mar. 4, 2015) (plaintiff identified no evidence to refute ALJ's findings regarding non-limiting effects of her obesity); De Lopez v. Colvin, No. EP-12-CV-374-ATB, 2015 WL 919806, at *5 (W.D. Tex. Mar. 2, 2015) ("The evidence in the record here fails to support, and Plaintiff has failed to demonstrate, how the combined effect of obesity with other impairments is disabling.").  Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ applied the appropriate legal standards in weighing the opinions of plaintiff's treating physicians and the non-examining medical experts.  Substantial evidence supports the ALJ's residual functional capacity findings.  The ALJ complied with the Appeals Council's remand order in considering the severity of plaintiff's depression and the limiting effects of her obesity.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[30]

New Orleans, Louisiana, this __17th__ day of August, 2015.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[30]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.